BANCROFT, (BACON v.) See Case No. 714.

BANCROFT, (CHAMPNEY v.) See Case No. 2,587.

BANCROFT, (FARNHAM v.) See Case No. 4,671.

BANCROFT, (HYDE v.) See Case No. 6,966.

---

## Case No. 835.

### BANCROFT et al. v. THAYER et al.

[5 Sawy. 502;[1] 8 Reporter, 39; 11 Chi. Leg. News. 304; 8 Amer. Law Rec. 257; 25 Int. Rev. Rec. 305.]

Circuit Court, D. Oregon. May 14, 1879.

POLICE POWER—CONTRACT WITH THE STATE—PUBLIC AGENTS—INJUNCTION.

1. A court of equity has power to enjoin the officers of a state from acting under a law which impairs the obligation of a contract made with the state.

[See note at end of case.]

2. Unless restrained by its constitution, a state, in the exercise of its police power may provide by contract that certain persons shall have exclusive privileges—as that, to supply the common schools of the state with text-books of a specified character and price.

3. An act of the state of Oregon authorized the adoption of text-books for the use of the common schools of the state, by a majority of the votes of the county superintendents, to be canvassed and declared by the board of education, and provided that the books so adopted should be exclusively used in such schools for the period of four years thereafter: *Held*, that such act did not constitute a contract with the publishers of the adopted books, by which the state was bound to use the same in its schools for said period, nor authorize the board of education to make any contract with such publishers on behalf of the state, concerning the furnishing and use of such books; but that said act was a mere regulation imposed by the state upon itself, and therefore the legislature might modify or abrogate it at pleasure.

[Cited in Ivison v. Board of School Com'rs, 39 Fed. 737.]

4. A state is not bound by the act of its agents, unless they are manifestly acting within the scope of their authority.

⸳[In equity. Suit for an injunction by A. L. Bancroft and Hubert H. Bancroft against W. W. Thayer, governor, R. P. Erhart, secretary, and L. J. Powell, superintendent,—constituting the Oregon state board of education, —to restrain respondents from adopting a new series of text-books in the common schools of the state. Bill dismissed.]

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

H. Y. Thompson and George H. Durham, for complainants.

Joseph N. Dolph, for defendants.

DEADY, District Judge. This suit is brought to enjoin the defendants, constituting the state board of education, from taking steps to adopt a new series of text-books for the common schools of this state, under section 12 of the act of October 29, 1872, as amended by section 4 of the act of October 4, 1878, (Sess. Laws, p. 61,) in place of the one now in use, published by the complainants.

The bill states that the complainants are citizens of California, and the defendants, of Oregon; that in pursuance of the act of October 29, 1872, aforesaid, entitled "An act to establish a uniform course of public instruction in the common schools of this state," the board of education, among others, adopted six books, published by the complainants, and known as the "Pacific Coast Series," as text-books to be used in the common schools of this state for the period of four years from October 1, 1873, which books were furnished by complainants during said period at fixed prices, in sufficient quantities for said schools; that said board of education, in pursuance of said act, again adopted said books for said schools for another period of four years from October 1, 1877; that in November, 1876, and prior to said second adoption, said board passed a resolution, prescribing "the manner of binding, the mode of printing, and the price to be paid for such series of books as might be adopted by said board for the said period of four years," and that the complainants, on November 26, 1876, "duly filed with the said board of education" their "written obligation," "wherein and whereby they undertook and agreed that if said Pacific Coast Series should be adopted for use in the common schools of Oregon, for the said period of four years from October 1, 1877," the complainants "would in all things comply with the demands of said board, as in said resolution set forth;" that thereupon said series of books "was adopted by the said board of education in the manner and form by law provided, and became the text-books to be used in the common schools of the state of Oregon" until October 1, 1881; that the complainants are bound to furnish, and said schools to receive, said books for said period, and complainants have so far complied with said contract, and are ready and willing to do so until the expiration of the same; that the complainants, in order to perform said contract, have been obliged to expend large sums of money in the purchase of material and labor for the manufacture of said books, and to publish and to keep on hand large quantities of the same, and, therefore, if such state board shall violate or fail to comply with the terms of said contract, the complainants will suffer great and irreparable loss; that on April 17, 1879, said board, in

violation of said contract, and with intent to disregard it, ordered the defendant, Powell, to issue a circular to the county superintendents, directing them to vote upon the adoption of a series of text-books for said schools for the purpose of authorizing other and different books than said Pacific Coast Series, to be used in said schools during the remainder of said period of four years.

Upon reading and filing the bill, April 23, an order was made that the defendants show cause why a provisional injunction should not issue, as prayed for, and that in the meantime they be restrained accordingly. The defendants showed cause by demurring to the bill, which on May 6 was argued by counsel.

The demurrer sets up: 1. This court has no jurisdiction of the cause; 2. There is a defect of parties, in this, that the state is not made a party defendant; 3. The complainants have an adequate remedy at law; and, 4. There is no equity in the bill.

At the argument, upon the decisive authority of Osborn v. Bank of United States, 9 Wheat. [22 U. S.] 738, wherein it was held that a court of equity may restrain, by injunction, a public officer of a state from acting under a void law of a state to destroy a franchise; that as the state cannot be joined as a defendant, its agent may be sued alone; and that the prohibition to sue a state, contained in the eleventh amendment to the constitution, does not extend to cases in which a state is not made a party on the record, even if the state has the entire ultimate interest in the subject of the suit—the first and second causes of the demurrer were expressly abandoned and the third one was not insisted upon.

Under the fourth cause it was maintained by counsel for the defendants: 1. That the power to regulate the common schools of the state is a part of the police power of the state which cannot be alienated or restrained even by express grant; 2. The law did not give the board of education or any one power to contract with the complainants to furnish school books for the use of the common schools of the state for any definite length of time, or at all; and, 3. No such contract appears to have been made.

The term "police power of a state" is a convenient and comprehensive expression used to signify those powers by means of which it not only preserves public order and prevents crime, but also promotes and secures good manners in the intercourse between its citizens, and thereby prevents a conflict of rights. 4 Bl. Comm. 162; Cooley, Const. Lim. 572.

The constitution of Oregon (article 8, § 3) declares that "the legislative assembly shall provide by law for the establishment of a uniform and general system of common schools." Now, if this be a police power— a mode of preventing crime or promoting good manners—as it probably is, the legis-lature may exercise it by contracting with any one to furnish books of a prescribed character and cost for the use of said schools for a definite period. To authorize and provide that, by means of contract or legislative grant, a particular person or persons shall have the exclusive right to do or furnish a particular thing, upon certain conditions, for the use and convenience of the public, has always been a common mode of exercising the police powers of the state, and unless the constitution imposes some limitation upon the power of the legislature in this respect, its action is final and binding. Slaughter-house Cases, 16 Wall. [83 U. S.] 66. As was well said by Mr. Justice Miller, in delivering the opinion of the court in the case last cited: "It may be safely affirmed that the parliament of Great Britain, representing the people in their legislative functions, and the legislative bodies of this country, have from time immemorial to the present day continued to grant to persons and corporations exclusive privileges—privileges denied to other citizens—privileges which come within any just definition of the word monopoly, as much as those now under consideration; and that the power to do this has never been questioned or denied. Nor can it be truthfully denied that some of the most useful and beneficial enterprises set on foot for the general good have been made successful by means of these exclusive rights, and could only have been conducted to success in that way."

To say that the legislature cannot barter away the police power of the state, or that one legislature cannot make a law which another one cannot repeal, is simply begging the question. It is not a question as to the comparative powers of different legislatures, but of the state. However many legislatures there may be, there is but one state, and it is a continuous being. The legislature is merely a means by which it exercises its powers.

The question is, then, could the state, as organized, make the contract? If it could, good faith requires that it should keep it; and under section 10 of article 1 of the national constitution it cannot pass a valid "law impairing the obligation" thereof. That it would be wise to place some limitations upon the power of the state to bind itself by contract, I admit. But that power is not in the courts, and can only be exercised by the people in the formation of the organic law.

It is claimed by the complainants that they have a valid subsisting contract with the state to furnish certain text-books for its common schools until October 1, 1881; and admitting, for the time being, that the transaction which is alleged to have taken place between the complainants and the state officers amounts in form to a contract to that effect, the question arises, was any one authorized by the state to make such a contract on its behalf?

The power to contract is claimed to be given to the board of education by the common school act of October 29, 1872. This act provides, in sections 10, 11 and 12 (Laws Or. 503,) for submitting the question of school books every four years to a vote of the county superintendents of schools. The vote is obtained by the superintendent of public instruction, acting under the direction of the board of education, sending a circular to each county superintendent containing a list of the studies required to be taught in the public schools, who "shall, after due consideration, write opposite each study the text-book preferred" by him, and return the circular to the state superintendent, "who shall cause the same to be laid before the state board of education, and the text-book in any one branch receiving the highest number of votes shall be the authorized text-book in that branch in the public schools of this state for the four years next succeeding the official announcement of the superintendent of public instruction." Every four years after "the first selection of text-books" the superintendent shall issue similar circulars for another vote on the question, and unless some new book shall receive a majority of the votes, no change shall be made during the ensuing four years. Section 17 provides that the board shall have power "to authorize a series of text-books to be used in the public schools, in accordance with the provisions of this act." But the legislature of 1878 amended section 12 aforesaid so as to empower the board of education to order an election for school books at any time when in its "judgment" any book in use is supplied "at an unreasonably high price, or is found to be excelled by more recent publications in that branch, or for any good and sufficient cause." It is further provided that any book adopted at such election shall be introduced into all the common schools of the state within six months thereafter. The defendants are proceeding under this amended section to order a new election at once.

These are all the provisions of law on the subject, and it will be seen at a glance that the power of selecting—"adopting"—school books is not in the board of education but the county superintendents. The only power the board has in the premises is to call the election for school books and to canvass the votes and declare the result. The power given them by section 17 aforesaid "to authorize a series of text-books" adds nothing to the case in this respect, for they can only exercise such power in the manner suggested by calling an election by the county superintendents and declaring the result.

After a careful consideration of the matter I am unable to find any authority in this legislation for making any contract with reference to the supply of school books. The county superintendents may vote to adopt and the board must declare the result and there-

by authorize the use of the books elected. But in all this there is no power to contract and bind the state beyond its power of revocation. Here the power of the officers ends, and the people in the several districts are left to get the books on the best terms they can, or do without them and forfeit their share of the public funds.

A law requiring the secretary of state to purchase stationery exclusively from the complainants for four years would bind the secretary, but not the complainants, and of itself would not constitute a contract between the complainants and the state. Nor would a formal agreement entered into between the parties, for the delivery of the stationery and specifying the character and cost of the material to be furnished change or enlarge the operation of the law in this respect. Such a law would be nothing more than a regulation which the state imposed upon itself in the person of its secretary and which by the agency of its law-making power, the legislature, it could change or abrogate at pleasure. Such, it seems to me, is the character and effect of this legislation to secure uniformity in school books. The act is not a contract nor a proposal which being accepted may become a contract, but a rule for the government of certain officers and people of the state. Neither does it authorize any one to make a contract as a means of carrying its provisions into effect or otherwise. It merely provides for the selection of a series of school books at certain fixed intervals and commands their use in the districts under a penalty. The state is the only party to the transaction, and may therefore modify the regulation at pleasure. An act directly requiring the schools to use the Pacific Coast Series for the ensuing four years would not be a contract with the complainants to that effect, nor authorize the board of education to make one with them to furnish such books. But the fact that this act provides that the selection shall be made through the intervention of certain officers does not change its character in that respect, and it is still merely a regulation imposed by the state upon itself to the effect, that only certain books shall be used in its schools for a certain period or until otherwise provided by the legislature. It is true, as appears, that the board of education from, as I supposed, a laudable desire to supply the defects and omissions of this crude and incomplete legislation, entered into an arrangement with the complainants at the time of the selection of their books, which, as between individuals, might well be considered a contract with a view of securing the people of the state a constant supply of the books adopted until October, 1881, of good workmanship and at a fair and fixed price.

But it is a well settled rule of law, that the state is not bound by the acts of its agents, unless it manifestly appears that they were acting within the scope of their authority;

and individuals as well as courts must take notice of the nature and extent of the authority conferred by law upon a person acting in an official capacity. "It is thought better that an individual should occasionally suf² fer from the mistakes of public officers or agents, than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment and injury of the public." Whiteside v. U. S., 93 U. S. 257.

There being then, no valid contract between the complainants and the state by which the latter is bound to use the books of the former in its schools, it follows, of course, that the complainants have no right to the relief demanded, and therefore the prayer for an injunction must be denied and the bill dismissed.