# Dickinson *v.* Cunningham.

## *Application for Mandamus.*

1. *Statute establishing uniform series of text books; confers exclusive right on publishers to furnish books.*—Under the provisions of the statute approved March 4, 1903, (Acts of 1903, p. 167), establishing a uniform series of text books to be used in the public free schools of the State, the publishers of the books that have been adopted by the Text Book Commission for use in the public free schools and who have entered into a contract with the State to furnish such books, are given the exclusive privilege of supplying the books so adopted by the State Text Book Commission to the pupils and patrons of the public free schools of the State; and, therefore, books purchased from persons other than such publishers or through the channels established by them, as provided by law, can not be used by pupils in the public free schools of the State.

2. *Same; same; same.*—Under such statute, it is an indispensable prerequisite to authorize books to be used by the pupils in the public free schools of the State, that the printing with reference to the price, etc., as provided for in sections 7 and 11 of the act, should appear on and in the book.

3. *Same; such law does not create a monopoly in violation of the Constitution.*—The act approved March 4, 1903, (Acts of 1903, p. 167), authorizing the adoption and establishment of a uniform series of text books to be used in the public free schools of the State, and conferring upon the publishers of the book adopted by the State Text Book Commission the exclusive

[Dickinson v. Cunningham.]

privilege of supplying said books, does not violate the pro-
visions of the Constitution against monopolies, (Const., 1901,
Art. I, § 22); since the purpose of the statute is not to confer
any pecuniary benefit upon the State or school officials or pub-
lishers, but to confer a benefit upon the public.

4. *Same; same.*—The fact that the State is not bound by a contract
authorized to be made by said statute giving a publisher the
right to furnish all the text books used in the public free
schools of the State, does not make the privilege invalid, so
as to relieve a school teacher from liability in violating the
provisions of the statute by using unauthorized text books, or
text books which had not been purchased from the publish-
ers or from some one of their established agencies.

5. *Same; not violative of section 45 of Constitution.*—The said act
is not violative of section 45 of the Constitution, which re-
quires that "Each law shall contain but one subject, which
shall be clearly expressed in its title;" every provision of the
statute being germane and complementary to the subject ex-
pressed in the title and necessary for the accomplishment of
the purposes of said act.

6. *Same; not violative of interstate commerce.*—Said statute does
not contravene the provisions of the interstate commerce law.

APPEAL from the City Court of Birmingham.
Heard before the Hon. CHAS. A. SENN.

The appellant filed a petition for a *mandamus* to com-
pel the appellee to admit his son as a pupil in one of the
public schools of Birmingham, and to accept the use of
certain books. The object of the application is to test
the validity of the act known as the "Uniform Text Book
Law," approved March 4th, 1903.—Acts, 1903, p. 167.

The title to the act is in the following language, to-
wit: "An Act, to create a Text Book Commission, and
to procure for the use in the public free schools in this
State a uniform series of text books; to define the duties
and powers of said commission and other officers; to
make an appropriation for the carrying into effect this
act, and to provide punishment and penalties for the vio-
lation of the same."

Section 1 creates a school board commission of the
State, and empowers and directs it to select and adopt ı
uniform series or system of text books for use in the
public schools in this State. The commission is to con-

sist of the governor, state superintendent of education, and three eminent teachers of the State to be appointed by the governor. The text books selected and adopted by the commission are to be used for five years in all the public schools of this State, and it is made unlawful for any school officer, director, or teacher to use any other text books on the same branches. The series of books to be selected cover all the branches of study usually taught in the public schools.

Section 2 provides for a sub-commission of five, to consist of a president or member of the faculty of one of the normal schools of the State; a president or member of the faculty of one of the agricultural schools; a superintendent of one of the city schools; and two teachers of the common schools, all to be appointed by the governor.

Section 3 requires the sub-commission to examine all books submitted for examination and report to the commission at such time as the commission shall direct, the books which they adopt, arranging each book in its class, etc.

Section 4 provides that the text book commission shall consider the report of the sub-commission in its selection and adoption of the uniform series of text books, and shall also themselves consider the merits of each book, taking into consideration their subject matter, the printing, binding, material and mechanical qualities, price, etc. When the report of the commission is completed it is required that the report of the sub-commission shall be filed in the office of the superintendent of education, subject to inspection by the public.

Section 5 makes the governor president of the commission; requires the commission to meet and organize immediately after the passage of the act, and provides that the superintendent of education shall be the secretary and executive officer of said commission. This section further provides that as soon as practicable, not later than thirty days after its organization, the commission shall advertise in such manner and for such length of time and at such places as may be deemed advisable, for sealed bids or proposals from publishers of

school text books, for furnishing books to the public schools in the State of Alabama, through agencies established by said publishers in the several counties, and places in counties in the State, as may be provied for in such regulations as said commission may adopt and prescribe. Each bid shall state specifically and definitely the price at which the books will be furnished, and shall be accompanied by one or more specimen copies of each and every book proposed to be furnished. Each bidder is required to deposit with the treasurer of the State a sum of money as the commission may require, not less than five hundred dollars, nor more than twenty-five hundred dollars, according to the number of books each bidder may propose to supply. This deposit is to be forfeited to the State if the bidder in the event his bid is accepted shall fail or refuse to make the contract and bond required by the act.

Section 6 provides that the commission shall meet at the time and place designated in the notice or advertisement and examine specimen copies of books submitted, upon which the bids are based and refer and submit these to the sub-commission, with instructions to the sub-commission to report back to them at a time specified, with the report, classification and recommendation. When the sub-commission's report is submitted the commission shall then meet in executive session and open and examine all sealed proposals submitted. It shall then be the duty of the commission to examine and consider the bids, together with the report and recommendation of the sub-commission and determine upon the books to be selected for adoption. The successful bidder is then to be notified and the contract executed. Each contractor is to give bond in a sum not less than ten thousand dollars nor more than thirty thousand dollars, payable to the State of Alabama, for the faithful, honest and exact performance of his contract.

Section 7 provides that the books furnished under the contract shall at all times during the existence of the contract be equal to the specimens furnished with the bids. It is further provided by this section that all contractors shall print plainly on the back of each book the

contract price, as well as the exchange price at which it
is agreed to be furnished.  It is then provided that, the
text book commission shall not in any case, contract
with the person or publisher for the use of any books
which are to be sold to patrons for use in any public
school in this State, at a price above or in excess of the
price at which such book or books are furnished by said
person or publisher under contract to any State, county,
or school district in the United States under like condi-
tions prevailing in this State and under this act.  And it
shall be stipulated in such contract that the contractor
has never furnished and is not now furnishing under
contract, any State, county, or school district in the
United States, where like conditions prevail as are pre-
vailing in this State, and under this act, the same book
or books as are embraced in said contract at a price be-
low, or less than the price stipulated in the contract.

Section 8 provides that it shall be always a part of
the terms and conditions of every contract made in pur-
suance of this act that that State shall not be liable to
any contractor, in any manner for any sum whatever,
but all such contractors shall receive their pay or con-
sideration in compensation solely and exclusively from
the proceeds of the sale of books, as provided for in this
act.  It is also provided that the contractor shall take
up the school books now in use in this State and receive
the same in exchange for new books at a price not less
than 50 per cent. of the contract price.

Section 9 provides for the rejection of any or all bids
and for readvertisement for sealed bids or proposals
under the same terms and conditions, and also for receiv-
ing proposals from authors who have manuscripts.

Section 10 requires the Governor, as soon as the con-
tract for furnishing or supplying books for use in the
public schools has been entered into, to issue his procla-
mation announcing such fact to the people of the State.

Section 11 requires the contractor to establish and
maintain two or more depositories in this State, to be
designated by the commission, where a supply of the
books sufficient for all immediate demands shall be kept.
It also requires that there shall be maintained in each

county in the State not less than three agencies, for the distribution of the books to the patrons. All books are required to be sold to the consumer at the retail contract price. It also requires that in each book shall be printed the following: "(The price fixed hereon is fixed by State contract, and deviations therefrom shall be reported to your county superintendent of education, or to the state superintendent at Montgomery.)"

Section 13 requires the state superintendent of education as soon as practicable after the adoption of the books provided for to issue a circular letter to each county superintendent of education and each teacher in the State and to such others as he may desire to send it, giving the list of books adopted, the prices, location of agencies, and manner of distribution, and such other information as he may deem necessary.

Section 14 provides that the books adopted shall be introduced and used as text books to the exclusion of all others in all the public free schools in the State.

Section 15 is in the following language, to-wit: "Be it further enacted, that nothing herein shall be construed to prevent or prohibit the patrons of the public schools throughout the State from procuring books in the usual way, in case no contract shall be made, or the contractor fails or refuses to furnish the books provided for in this act, at the time required for their use in their respective schools."

Section 16 makes it a misdemeanor for any person or teacher to violate the provisions of this act.

Section 17 makes it a misdemeanor for any teacher to use, or permit to be used in his or her school any book other than the one adopted.

Section 18 makes it a misdemeanor for any clerk or agent to sell the book for more than the contract price.

Section 19 appropriates two thousand dollars for the purpose of carrying out the provisions of this act.

Sections 20 and 21 deal with the compensation of the commission and clerk.

Section 22 fixes the term of the contract at five years; and provides that the act shall not apply to those counties which have adopted a uniform system of text books

and entered into contracts for the supply of books, until such contract expires.

Section 23 provides for the remedy when the contract is forfeited.

Section 24 provides that the act shall take effect from and after its passage.

It is alleged in the petition for the writ that under the provisions of the act and prior to the 21st day of September, 1903, the State Text Book Commission had adopted a series or system of text books for use in the public free schools in the State of Alabama, and that after the series or system was adopted, that the Governor and Secretary of State did on the 10th day of July, 1903, enter into a contract with the American Book Company to supply the books adopted for use in the public free schools. It is further shown by the petition that after the execution of said contract, the American Book Company did before the 21st day of September, 1903, establish in the city of Birmingham a depository, for the supply of the books adopted for use in the public free schools in Jefferson county, and that Loveman, Joseph & Loeb were designated as the managers of said depository in said county, and that said managers as such had received, and were ready, willing and able to supply the books for use in the public free schools in Birmingham.

It is further alleged in the petition that the high school is one of the schools constituting the public school in the city of Birmingham, Alabama, and that the appellee, J. B. Cunningham, is the principal of said high school; that said high school opened in regular session on Monday, the 21st day of September, 1903, and that on that day appellant applied to the appellee as principal of said school to enter his son, Alfred Dickinson, as a pupil in said high school. It is further shown that the son was at the time in all respects eligible for admission into said school as a pupil, and when he applied for admission he carried with him books for use in said school, which were identical in matter and authorship with those adopted by the Text Book Commission, that were supplied by the American Book Company, and that were in use in said school, except that the books carried and pre-

sented for use by appellant's son did not have printed on the back any contract price, or exchange price, nor did they have printed in them the following: "The price fixed hereon is fixed by State contract, and deviations therefrom shall be reported to your county superintendent of education, or to the state superintendent at Montgomery." It also appears from the petition that the books were not purchased at the depository, but were purchased from Dewberry & Son in Birmingham, who had no connection with the depository whatever. It is also shown by the petition that the pupil did not have a certificate from a teacher, or other school officer that the books he carried with him were in his hands at the time the system was adopted, on, to-wit, the 20th day of June, 1903.

Attached to the petition for *mandamus* and made a part of it, are exhibits of copies of a correspondence which passed between the appellant and appellee, the appellee and Dr. J. H. Phillips, superintendent of the public schools of the city of Birmingham, and between Dr. Phillips and the State Superintendent of Education, showing that appellee was following the instructions of his superior officers in declining to admit the pupil with the books presented by him. There is also attached to the petition and made a part of it, a copy of the contract made by the State with the American Book Company, and also a copy of the circular of information which was issued by the State Superintendent of Education in conformity with section 13 of the act.

In response to the rule *nisi* which was issued to the appellee on the filing of the petition, the appellee appeared and filed a demurrer to the petition. The grounds of this demurrer were as follows:

"1. It appears from the averments of the petition, that the books offered to be used by petitioner's son were not those adopted and provided for by the State Text Book Commission. 2. It appears from the averments of the petition, that the books presented by petitioner's son did not have on the back of each book the contract price, as well as the exchange price required by section seven of the act, and the statement as to price therein re-

quired by section 11 of the act. 3. It does not appear from the averments of the petition, that the books presented by the son of petitioner bore a certificate made by the teacher or other school officer, that the books were actually in the hands of the pupil at the time of the State adoption. 4. It appears from the averment of the petition, that petitioner could have procured books, bearing the stamp and inscription, required by the act, and no reason is alleged why such books were not procured, instead of those which were actually presented and sought to be used. 5. It appears from the averments of the petition that petitioner is not entitled to the writ of *mandamus.*"

On the submission of the cause upon the demurrer, it was ordered, adjudged and decreed that the demurrer be sustained; and the petitioner declining to plead further or amend his petition, the petition was dismissed.

From the judgment sustaining the demurrer and dismissing the petition, the respondent appeals, and assigns the rendition thereof as error.

A. O. LANE, for appellant.—The act is unconstitutional, if it gives the exclusive privilege claimed for it to the publishers to whom is awarded the contract to supply the books to be used by the public free schools.

In the language of the distinguished jurist, H. M. SOMERVILLE, "Monopolies were void at the common law, and are not commonly conferred by legislative grant, and need no special prohibition in the organic law of a free republic. They may be regarded as relics of governmental folly rendered odious by royal prerogatives in the most extravagant periods of European monarchies." *Birmingham & Pratt Mines Street Railway Co. v. Birmingham Street Railway Co.,* 79 Ala. 473.

It must be borne in mind that the contract in question is not one between the State of Alabama, on the one part, and the American Book Company, on the other, whereby the latter is to furnish books to the former for a definite period. That is not the case at all. Both the Act (section 8) and the contract (section 7) expressly provide that the State is not to be, in any wise, liable under the

contract, and it is not to take a single book from the company, which shall receive its compensation solely and exclusively from the sale of its books to individual citizens. The case is on "all fours" with the case cited above in which the mayor and aldermen of Birmingham undertook to grant an exclusive privilege to a street railroad company to operate street cars in Birmingham; the company to get its pay from street car fares; and the court very properly held the grant unconstitutional even if the Legislature had undertaken to empower the city to make such grant.

This above case is cited and approved by the Supreme Court of the United States in *In re Bienville Water Supply Co. v. Mobile*, 186 U. S. 219.

The act is also unconstitutional in that it violates section 45 of the Constitution, which provides that each law shall contain but one subject, which shall be clearly expressed in its title. There is nothing in said act which gives any intimation or puts any one on notice that the exclusive privilege was intended to be granted. The act as construed by the respondent runs counter to the interstate commerce law.—*Addyston Pipe & S. Co. v. United States*, 175 U. S. 229; *United States v. E. C. Knight Co.*, 156 U. S. 33; *In re Roher*, 140 U. S. 558; *Wilson v. Missouri*, 91 U. S. 282.

CABANISS & WEAKLEY, *contra.*—Upon consideration of the act here asked to be construed, there can be no other conclusion than that it was intended by the Legislature for the contractor or publisher to have the exclusive right to furnish the book or books agreed to be supplied by him in the public free schools in the State. In the first place, the publisher is notified, by the advertisement calling for bids, that sealed bids or proposals will be received from the publishers of school text books for furnishing books for the public schools in the State of Alabama, through agencies established by said publishers in the several counties, and places in the counties, in the State, as may be provided for in such regulations as said commission may adopt and prescribe.

[Dickinson v. Cunningham.]

According to the usual and well-known course of business, when one is invited to submit bids to furnish goods or material, it is understood that he is to have the exclusive right to furnish such goods or material, during a certain period, unless the contrary is expressly provided. In this case, the contracts were made by the publishers with the State of Alabama, and, although the State of Alabama is not bound to pay anything for the books, it is bound, we submit, by every consideration of right and fairness, to see that the publishers shall have the exclusive right to furnish the books which they have contracted to furnish, during the period of the contract.

The construction here contended for is the only logical construction, when we take in consideration the object and purposes of the act. That purpose was to provide a desirable class of text books, for use in the public schools of the State, at cheap and uniform prices. Publishers were notified to present their bids, on the understanding that they should have the exclusive right to supply the books for all the public schools in the State. Presumably, in consideration of having the exclusive right, they felt justified in making a low price—particularly since the contract could only be obtained after competitive bidding on the part of other publishers, and bids submitted by them for supplying like books. The State sought to protect the patrons of the schools by providing that the price of every book should be stamped thereon, and by providing further, that warning or notice should be given by the publisher by having printed in each book that the price stamped on the book was fixed by contract, and that any deviation therefrom should be reported to certain authorities; and further protection was provided by requiring all books furnished to be equal to the specimen or sample copies submitted with bids.

It cannot be supposed, for an instant, that the publishers would have ever submitted to these obligations, if it had not been clearly understood that they should have the exclusive right to supply the books. But this contention does not rest on inference only; in section 14, as above shown, it is provided, that the books adopted as a uniform system of text books shall be introduced and

used as text books, to the exclusion of all others; and, in section 15, it is further provided, that patrons of the public schools throughout the State may procure books in "the usual way," in case no contract is made, or in case the contractor fails or refuses to furnish the books, as provided for in the act. This is tantamount to saying, that patrons of the public schools throughout the State may not procure books in the "usual way"—that is to say, from independent dealers or outside sources—except in one of the two cases mentioned. The maxim, *"expressio unius est exclusio alterius,"* is of very important application in the interpretation of statutes; it is particularly applicable (as said in Black on Interpretation of Laws) in the construction of such statutes as create new rights or remedies, derogate from the common law, impose penalties or punishments, or otherwise, come under the rule of strict construction.—Black on Interpretation of Laws, p. 147.

It follows, we think, that, under the terms of the act, the patrons of public schools may not now procure books in the "usual way"—which is to say, the way in which they were permitted to procure them before the act went into effect—except in the two instances mentioned in section 15, neither of which obtains in the present case. In other words, they must buy books furnished by the publishers who have contracted with the State to furnish them.

The construction of the act contended for by us would not render it unconstitutional, as claimed by the petitioner, either on the ground of its constituting a monopoly offensive to the law, or as being in derogation of any right of the citizen. We have the authority of the Supreme Court of Tennessee for saying, that in more than twenty States of the Union laws have been enacted providing for uniform text books in the public schools, and in none of them, so far as we have been able to learn, has such legislation been overturned by the courts. In at least two States, where the acts were very similar to ours, they were vigorously assailed on several constitutional grounds—among others, that they created an illegal monopoly—and in each case, the act was upheld and

found to be free from any constitutional objection. See *Edward Leeper v. The State of Tennessee*, 48 L. R. A. 167; *Indiana ex rel. Clark v. Haworth*, 7 L. R. A. 240.

This case was followed by that of *State ex rel. Snoke v. Blue*, 122 Ind. 600. Other cases will be found in the note to the case of *Campana v. Calderhead*, (Mont.) 36 L. R. A. 277. In the following cases, legislation of this precise nature was sustained: *Curryer v. Merrill*, 25 Minn. 1; 33 Am. Rep. 450; *Bancroft v. Thayer*, 5 Sawy. (U. S.) 502; *People v. Board of Education*, 55 Cal. 331; *Baltimore School Commissioners v. State Board of Education*, 26 Md. 505. See 21 Am. & Eng. Ency. Law, pp. 776-777.

DOWDELL, J.—The appellant's first contention is that, under the provisions of the act and the contract made with the American Book Company, the company has not the exclusive right to furnish the books that were adopted by the Text Book Commission for use in the public free schools, and that under the law a patron of the public schools may purchase the books for use by his child in the public free school from any one who deals in such books so long as the books are by the same author and have the same subject matter, as those adopted by the commission. That under the law it is not an indispensable prerequisite to render the books receivable in the public schools, that the printing with reference to the price, etc., provided for in sections 7 and 11 of the act, should appear on and in the books.

The next contention of the appellant is that, if the act and the contract secures to the American Book Company, the exclusive privilege of supplying the books adopted by the Text Book Commission, then the act is obnoxious to the State Constitution, and contravenes the provisions of the Interstate commerce law, and cannot therefore, be enforced.

A comparison of the enactment under consideration with the uniform text book statute of the State of Tennessee, reveals a very striking similarity between the two, and it would be a difficult matter to differentiate them. Indeed, the two statutes are substantially the

same and in many respects identical. It appears that the titles are precisely alike, *verbatim et literatim*.

It would seem that this striking similarity did not come by accident, but it must be accounted for on the theory that the draftsman of the Alabama statute had the Tennessee statute before him when he drew the Alabama statute.

We have mentioned this similarity for the reason that, the Tennessee statute has been construed by the Supreme Court of that State, and upheld by it in a very elaborate and able opinion by Judge WILKES.

In the Tennessee case the assailant of the statute, unlike the appellant in this case, admitted that the act and the terms of the contract made in pursuance of it, secured to the person with whom the State contracted the exclusive privilege of furnishing the text books adopted to the schools and their patrons. And on this account it was insisted that a monopoly was created and that the act could not be enforced.—*Leeper v. State,* (Tenn.) 48 L. R. A. 167.

The question then recurs, does the act and contract secure to the American Book Company the exclusive privilege of supplying the books adopted by the Text Book Commission for use in the public free schools in Alabama?

Tested by the canons of construction applicable to statutes, we have no doubt that it was the intention of the Legislature to secure to the person who proved the best bidder in the open competition so carefully provided for by the act, the exclusive privilege of supplying the books adopted by the Text Book Commission to the public free schools and the patrons of them. As was said in *Leeper v. State, supra,* "it is indeed hard to construe the statute as to deny the exclusive privilege of the successful competitor, since the language employed by the Legislature clearly and unmistakably indicates its intention to exercise its power by creating a uniform system, and to our minds it quite as clearly evinces a purpose to secure the practical enforcement of the system." "Two things are very clear to our minds: one, that the Legislature meant to provide an exclusive privilege in order

to secure books at the best prices; the other, that the Legislature meant to prevent the possibility of any break in the uniformity of the system framed by the statute."

We, therefore, hold, that the act in connection with the contract made and entered into by the State with the American Book Company, secures to that company the exclusive right to supply the books adopted and stipulated in its contract, to the public free schools and the patrons thereof.

"But it is said that, if it be granted that a uniform series may be selected, still it is beyond the power of the Legislature to confer upon one individual, or concern, the right to publish and sell to the patrons of the public schools any particular book or books, and to prohibit teachers and patrons from using any other." This contention presents a fruitful field for discussion, but we have not the inclination to indulge in the discussion at great length, nor do we believe the exigencies of the case require it. The contention of the appellant is rested upon the proposition that if the exclusive privilege is secured to the American Book Company a monopoly is thereby created, and it would fall under the prohibition contained in the 22d subdivision of the Declaration of Rights, as found in the State Constitution. The prohibition is to the effect, that the Legislature cannot pass a law which confers exclusive grants or special privileges. We think it is very easy of demonstration, that the privilege secured to the Book Company to furnish the books is not a grant of a special privilege, within the meaning of the subdivision of the Declaration of Rights above quoted, and that it is not a monopoly which is offensive to the law.

Section 356 of the Constitution provides that the Legislature shall establish a liberal system of public schools throughout the State for the benefit of the children thereof between the ages of seven and twenty-one years. This is quoted to show that the power to regulate and control the public schools is confided to the Legislature. "If the power to regulate and control public schools does reside in the Legislature, then the Legislature must exercise its discretion and adopt such measures as it

deems best, and if the measure adopted lead to the exclusion of some book owners it is an incident that no ingenuity can escape nor system avoid."—*State of Indiana v. Haworth,* 7 L. R. A. 240.

Judge COOLEY says that it is held competent for the State to contract with a purchaser to supply all the schools of the State with text books of a uniform character and price."—Cooley's Const. Lim. (5th ed.), 225, note 1; *Bancroft v. Thayer,* 5 Sawy. 502.

In the case last above cited is this language: "To authorize and provide that by means of legislative grant or by contract a particular person or persons shall have the exclusive right to do or furnish a particular thing, upon certain conditions, for the use and convenience of the public schools, has always been a common mode of exercising the public power of the State." The Tennessee case cited above is, so far as the question in hand is concerned, a very helpful authority. Art. 1, § 22 of the Tennessee Constitution provides, among other things, that perpetuities and monopolies are contrary to the genius of a free state, and shall not be allowed. Art. 11, § 8 of the same Constitution, provides among other things, "that the Legislature shall not have power to pass any law granting any individual right, privileges, immunities, or exemptions, other than such as may be by the same law extended to any member of the community who may be able to bring himself within the provisions of this law." This last section quoted from the Constitution of Tennessee, is very similar to section 22 of our Declaration of Rights, quoted above. It really has the same meaning. It was insisted in the *Leeper* case that the provisions of the Constitution above quoted were violated by the Text Book Law of Tennessee. The Supreme Court of Tennessee in passing on the contention, states the proposition in this language, to-wit: "There may be presented together, as presenting the general question that the effect and operation of the act is to grant to the publisher who has been successful in obtaining the privilege of furnishing the books a monopoly, and has conferred on him special rights, privileges, immunities and exemptions, and thus a monopoly is allowed, and that the

people generally of the State are deprived of the right and privilege of (1) selecting their own school books, (2) of buying them in the open market, and (3) other publishers are excluded from selling in competition with the successful party." Discussing the question that court says: "It may be noted that the act only applies, and the inhibition only extends, to persons interested in public schools as officers, teachers, patrons, and pupils, and only to books that are used and to be used in public schools; any book may be bought, and from any person, and by any person, and put to any use. This is the common right to buy and sell which existed before the act was passed and which still continues unaffected. The books may now be bought as freely as before the Act. It is the use in the public schools which the act regulates, and is intended to regulate. So that as to the buyer no common right is taken away. As to the seller he may also sell as before the act; and not only so, but, under the provisions of the act, the exclusive right to publish and sell for schools was left open to his competition in the first instance, that is, all publishers were invited to freely compete for the contract or privilege of furnishing all the books, or any series of them, to be used in the schools."

It is certainly not the purpose of the act to confer a pecuniary benefit on the State, or school officials or publishers. "On the contrary, its evident purpose is to confer a benefit upon the public, by providing ways and means by which the books may not only be made uniform throughout the State, but also furnish to the public at as small cost as possible. If a privilege thus conferred upon an individual, the object of which is to benefit the State and its citizens, can be termed a monopoly, it is certainly not of that class prohibited by law, which refers to privileges granted for a money consideration, or which are bestowed upon an individual for his benefit. The monopoly which is obnoxious to the law, or the special exclusive privilege under the ban of the Constitution, is a privilege farmed out to the highest bidder, or conferred because of favoritism to the donee, and not one awarded to the lowest bidder, and for the convenience

and benefit of the public. If this doctrine be not correct, then the State can make no contract for supplies for its penitentiary, for its charitable institutions, for its public printing, or any other work of public utility or necessity; for when it has, perchance after the sharpest competition, awarded a contract or privilege for any particular enterprise, such contract becomes at once a monopoly, because every other citizen of the State may not also do the work or furnish the material. In other words, to let any public work to the lowest bidder creates at once a monopoly, and special exclusive privilege contrary to the Constitution. If this contract with the publisher to furnish all the books needed in the public free schools were not coupled with a restriction upon price and other benefits to the citizen, then it might be denominated as a monopoly."—*Leeper v. State,* (Tenn.) 48 L. R. A. 167.

We are clear in our conclusion that the statute does not create a monopoly, nor grant a special exclusive privilege of the kind which would be obnoxious to the Constitution, or the common law. In reaching this conclusion we have not been unmindful of what was said by the court in the case of *Birmingham & Pratt Mines Street Railway Co. v. Birmingham Street Railway Co.,* reported in the 79 Ala. 465, on the subject of monopolies. There the court was dealing with a contract made by and between the municipality and individuals, whereby the municipality granted to the individuals the exclusive right to contract and operate a street railway over and upon certain streets in the city of Birmingham. The facts of the case clearly differentiate it from the case we have in hand.

We have noticed, too, the point made by the appellant in connection with the principle announced in the case reported in the 79 Ala. 465, *supra,* that the contract is not one between the State of Alabama on the one part, and the American Book Company on the other part, whereby the latter is to furnish books to the former for a definite period. This same point was urged against the Tennessee statute, and the response of the court in that case is so clear and satisfactory that we content ourselves

[Mitchell v. Gambill.]

with the citation of the authority.—*Leeper v. State,* (Tenn.) 48 L. R. A. 171.

It is also insisted by the appellant that the act was passed in violation of section 45 of the Constitution. This section requires that "each law shall contain but one subject, which shall be clearly expressed in its title."

After carefully examining the title and the act it seems to us that this insistence is untenable. We are satisfied that every clause in the statute is germane and complementary to the subject expressed in the title, and necessary to a full rounding out of the purpose of the act. We, therefore, hold that the act is not offensive to the 45th section of the Constitution.—*Ballentyne v. Wickersham,* 75 Ala. 533; *Ex parte Mayor of Birmingham,* 116 Ala. 186; *State ex rel. Williams v. Griffin,* 132 Ala. 47; *Mitchell v. State,* 134 Ala. 392.

Lastly, the appellant contends that the act runs counter to the interstate commerce law. We cannot see any ground for the support of this contention, we think there is no merit in it.

It follows from the foregoing considerations that the city court properly sustained the demurrer to the petition for the *mandamus,* and that its judgment must be affirmed.

Affirmed.