# Birmingham & Pratt Mines Street Railway Co. *v.* Birmingham Street Railway Co.

*Bill in Equity for Injunction between Street Railway Companies.*

1. *Injunction against invasion of private franchise.*—A court of equity has undoubted jurisdiction to restrain by injunction, an invasion of a franchise lawfully granted, on valuable consideration, by a person or corporation claiming under a subsequent invalid grant.
2. *Constitutional protection to franchises granted by corporations.*—A franchise granted by a municipal corporation, on valuable consideration, by an ordinance in the nature of a contract, if legal, is within the protection of the constitutional provision against laws impairing the

obligation of contracts; and it can neither be taken away by the repeal of the ordinance, nor impaired by a subsequent grant of such franchise to another.

3. *Municipal corporations; powers of.*—Municipal corporations can only exercise such powers as are expressly granted in their charter, or such as may be necessary and proper to carry the express powers into effect, including such as are indispensably necessary to the declared objects and governmental purposes for which such corporations are created; and any reasonable doubt as to the existence of a power claimed to be conferred by the charter, will be resolved against the corporation.

4. *Grant of exclusive franchise, in perpetuity, to street railway company.*—Neither the charter of the city of Birmingham, nor the general statutes, confer on that corporation the power to grant, by ordinance in the nature of a contract, the exclusive franchise in perpetuity of running a street railway through certain designated street and avenues of the city; and if such power were granted by its charter, or by any public statute, it would be violative of the constitutional provision (Art. I, § 23) against the passage of any law "making any irrevocable grant of special privileges or immunities."

APPEAL from the Chancery Court of Jefferson.

Heard before the Hon. THOMAS COBBS.

The bill in this case was filed on the 19th day of March, 1886, by the Birmingham Street Railway Company, a private corporation, against the Birmingham and Pratt Mines Street Railway Company, also a private corporation, and the several persons composing it; and sought to enjoin and restrain the defendants from attempting to operate or construct a street railway on "Eighteenth street" and "Avenue B South" in the city of Birmingham, or otherwise interfering with the complainant's alleged exclusive right to a railway along or through said streets. The complainant claimed this exclusive right under a written contract, a copy of which was made an exhibit to the bill, in these words:

"This contract, made and entered into this 19th May, 1882, by and between the mayor and aldermen of the city of Birmingham, parties of the first part, and Ben. F. Roden, W. H. Morris and associates, parties of the second part, *witnesseth*, that for and in consideration of the terms, covenants and agreements herein stated, and the further sum of one dollar each to the other paid, the receipt whereof is hereby acknowledged, the parties hereto contract and agree as follows: (1st.) The parties of the first part hereby grant to the parties of the second part and their assigns the rights and privileges of surveying, locating, contructing, equipping, and to operate a street railway in and along the streets and avenues of said city of Birmingham, Alabama, and over and along the following streets, avenues, and parts of said city, to-wit: The exclusive right to construct and operate a street railway, with the necessary and proper turn-outs and side-tracks for the same, over and upon

Fourteenth, Eighteenth, Nineteenth, Twentieth, Twenty-fourth [streets], and First, Second, Third, Fourth and Fifth avenues north, and avenues A, B, C, D and E, south; *provided,* the exclusive right herein granted shall not apply to such of said streets and avenues as are not occupied by the party of the second part within ten years from the date of this contract. (2d.) The party of the first part further agrees to pass such ordinances as may be necessary for the proper running and safety of the tracks and property of the said party of the second part; and to prohibit wagons, hacks, drays, and other vehicles, from standing upon, or in the way of the tracks or cars of said party of the second part. (3d.) The parties of the second part agree to at once organize themselves into an incorporated company under the laws of Alabama, and the rights and privileges herein granted are to be transferred to said company when so incorporated. The parties to the second part further agree and obligate themselves to construct and operate said street railway in such manner [as] to conform with the most improved plans of street railways, as now used in other cities. They agree to charge an amount for passengers not exceeding five cents for each passenger, a fare being considered from one end of the line to the other. The parties of the second part further agree to conform to all just and reasonable regulations of the party of the first part, in regard to running and speed of the cars of said railway; and to hold the city harmless from liability to any person or persons for damages caused by the neglect or carelessness of the party of the second part, their agents or employees. The party of the second part further agrees to begin the construction of said street railway within twelve months from the date of this contract, and to have at least one mile in first-class running order, on or before the first day of January, 1884. In witness," &c.

The bill alleged that this contract was made, and signed by the mayor for the municipal authorities, under authority of an ordinance adopted at a regular meeting of the city council of Birmingham; but the ordinance was not made an exhibit to the bill, nor is it anywhere set out in the record. It was alleged, also, that the defendants claimed to be acting under authority conferred on them by the city council, and had taken the preparatory steps to organize themselves as a private corporation, but had not completed their organization; and the complainants insisted that this grant to the defendants was void, because violative of the prior exclusive grant to complainant. The defendants demurred to the bill for want of equity, on the ground that the exclusive grant to the complainant was void; and they also moved to dissolve the injunction, and to dismiss the bill for want of equity. The chancellor overruled the demurrer and the motions, and his decree is now assigned an error.

[Birmingham & Pratt Mines St. R'y Co. v. Birmingham St. R'y Co.]

HEWITT, WALKER & PORTER, and J. M VANHOOSE, for appellant.—The complainant derives its corporate character, rights, powers and franchises, not from its contract with the municipal authorities of Birmingham, but from its incorporation under the general statute.—Code, §§ 1917–29. The general statute does not confer any exclusive right or franchise on a corporation chartered under its provisions; and in providing that the corporation may contract with the proper authorities of any city or town, in reference to the terms and manner in which the road should be used, reference was had only to the rate of speed at which the cars may be run, the kind of rails to be used, the manner in which the track shall be constructed, and other police matters. The General Assembly is prohibited from making "any irrevocable grants of special privileges or immunities," and could not confer on a municipal corporation a power which is prohibited to itself. So far as the municipal authorities attempt to grant an exclusive franchise, and in perpetuity, the contract or grant is void, and does not hinder a subsequent grant to another corporation or individual.—Const. Ala., art. I, § 23; 2 Dillon on Mun. Corp., §§ 575, 727; *Gas Light Co. v. City Gas Light Co.*, 25 Conn. 19; *State v. Gas Light Co.*, 29 Wisc. 454; *State v. Gas Light & Coke Co.*, 18 Ohio St. 262; *Minturn v. Larue*, 3 Miller, 636; *Charles River Bridge v. Warren Bridge*, 12 Curtis, 496; *Mills v. St. Clair County*, 17 Curtis. 707; *Newton v. Comm'rs*, 10 Otto, 548; *Davis v. Mayor of New York*, 14 N. Y. 523; 27 N. Y. 622; *People v. Kerr*, 27 N. Y. 188; *Mayor v. Railroad Co.*, 16 Penn. St. 355; *Comm'rs v. Railroad Co.*, 27 Penn. St. 339: *Gale v. Kalamazoo*, 23 Mich. 344. *Logan v. Pyne*, 43 Iowa, 524; s. c., 22 Amer. Rep. 261; Cooley's Const. Limitations, 207, 2d ed.; 24 Fed. Rep., No. 7, p. 306.

WEBB & TILLMAN, and R. H. PEARSON, *contra*. (No brief on file.)

SOMERVILLE. J.—The equity of the complainant's bill in this case depends, in our judgment, upon a single inquiry, and that is, whether the municipal authorities of the city of Birmingham were invested by law with the power to make to the appellee—the Birmingham Street Railway Company—an *irrevocable* grant of the *exclusive* privilege to construct and operate a street railway over and through certain streets and avenues of that city. If the power to grant such a franchise resided in this municipality, and if the franchise has been lawfully granted, upon a valuable consideration, by an ordinance in the nature of a contract, there can be no doubt either of the jurisdiction or of the duty of a court of equity to protect the

[Birmingham & Pratt Mines St. R'y Co. v. Birmingham St. R'y Co.]

invasion of the right, by issuing an injunction to prevent con-
tiguous competition on the part of the appellants, in their
efforts to establish an opposition railway company over any of
the same streets or avenues previously included in the grant to
the appellee.—1 High on Inj. (2d Ed.), § 902. If, however,
the power in question did not exist, then the grant would be
void, so far as it purports to be exclusive in its nature; the
bill, in such contingency, is without equity, and the court must
be pronounced to have erred in refusing to dismiss the bill for
want of equity, and in refusing to dissolve the injunction
granted at the instance of the complainant.

Before we proceed to discuss the power of the mayor and
aldermen of the city of Birmingham to grant such a franchise,
we propose to first consider the nature of the thing granted,
or the character and terms of the franchise itself.

It bears date on the nineteenth day of May, 1882, was duly
enacted by ordinance, and purports to be in the form of a
regular contract between the subscribing parties. The privi-
lege granted was the exclusive right to construct and operate a
street railway, with the necessary side-tracks and turn-outs,
over and upon fifteen designated streets and avenues of the
city. The only limitation of this grant, in point of time, is
the proviso, that it shall not apply to such of said streets and
avenues as shall not have been occupied by the grantee within
ten years from the date of the contract. The franchise, it will
thus be seen, is one not only exclusive in its nature, but in per-
petuity, being without limit of duration, except as to an option
to exercise it, which was to continue for ten years. When
once put in exercise, it purports to last forever. The main
consideration, on the part of the grantee, was the agreement to
construct one mile of such railway, and to transport passengers
at a fare not exceeding five cents from one end of the line to
the other. Certain powers of police and regulation are retained
to be exercised by the city, not necessary to be mentioned. For all
the purposes of this discussion, we shall consider this franchise as
a contract beteen the mayor and aldermen of Birmingham, and
the appellee, such as, if valid and binding, would be fully pro-
tected from violation by both the constitution of the United
States and of this State, each of which instruments prohibits
the passage of any laws by State or municipality impairing the
obligation of contracts. So, we shall consider the contention
of the appellee as well taken, that if the grant of this exclusive
right be obnoxious to no objection, either on constitutional
grounds or for want of the charter power to make it, the ob-
ligation of the contract would be impaired by the subsequent
grant of a similar franchise to the appellant company to build
their competing road over and along the street and avenue in-

[Birmingham & Pratt Mines St. R'y Co. v. Birmingham St. R'y Co.]

cluded in the appellee's franchise, and embraced in this controversy.—*New Orleans Gas Co. v. Louisiana Light Co.*, 15 Wall. 650 ; *The Binghamton Bridge*, 3 Wall. 52.

The contention of the appellants in this case is, that the contract in question, so far as it purports to grant to the appellee the *exclusive* right to railway privileges over the streets designated, is void for two reasons. First, on the ground that there is no clause in the charter of the city, nor any other law of the General Assembly, which authorizes the making of such a contract; and, secondly, because the contract itself is in violation of section 23 of article I of the Constitution of Alabama, which provides, that no law shall be passed by the General Assembly "making any irrevocable grants of special privileges or immunities." If either of these positions can be successfully maintained, the exclusive feature of the franchise is without warrant of law, and must of its own weight fall to the ground.

The power to make this exclusive grant, which, though not strictly a monopoly, is certainly in the nature of one, must be derived either from some clause in the charter of the city, from the laws of the State, under which the appellee railway company was organized, or from the constitution of Alabama, which is the organic law of the State.

The only section of the present constitution, of 1875, bearing on the subject of street railways, is section 24, of article 14, which provides that "no street passenger railway shall be constructed within the limits of any city or town, without the consent of its local authorities." This is prohibitory, and not permissive in its nature, and confers no franchise or right of any kind on any person or corporation, much less one of an exclusive character. This is not denied, and is too obvious for argument.

The present charter of the city, enacted March 1, 1881, and the one in force at the time of the alleged grant, is silent on the subject of street railways. There is a power conferred in sub division 18 of section 20, authorizing the city authorities "to regulate and control the running of cars or locomotives upon or across the streets. avenues or alleys of said city, and to regulate and control the speed of such cars, engines or trains, within the corporate limits of the city."—Acts 1880-81, p. 481. The better opinion would seem to be, that this clause has reference only to cars propelled by steam, and not to ordinary passenger street railways, unless drawn by locomotives.— *People's Railroad v. Memphis Railroad*, 10 Wall. 38, 51. But, assuming the opposite to be the correct view, or assuming that the power to regulate and control the running of such cars exists as an incidental police power under other clauses of

[Birmingham & Pratt Mines St. R'y Co. v. Birmingham St. R'y Co.]

the city charter, which is probable, it is unquestionably true, that such a power confers no right on the city authorities to grant to any person or corporation a privilege exclusive in its character, and without limit as to duration.   The authorities in support of this proposition are so numerous and uniform that we will not stop to argue it at any length.—Cooley's Const. Lim. (5th Ed.) 252 (*207; 1 Dillon on Mun. Corp. (3d  Ed.) § 114, § 262; *Logan v. Pyne*, 43 Iowa 524; s. c., 22 Amer. Rep. 261; *City of Chicago v. Rumpff*, 45 Ill. 90; *Milhau v. Sharp*, 27 N. Y. 611; *Davis v. Mayor of New York*, 14 N. Y. 506.

This conclusion is but the logical result of the rule, now so well established, that municipal corporations can exercise only such powers as are expressly granted in their charter, or such as may be necessary and proper to carry such express powers into effect, including such as are indispensably necessary to the declared objects and governmental purposes for which such corporations are created.   And any reasonable doubt as to the existence of a power claimed to be conferred by the charter will be resolved by the courts against the corporation, and in favor of the public—*City of Eufaula v. McNab*, 67 Ala. 589; 1 Dillon on Mun. Corp. (3d Ed.), § 89; *Logan v. Pyne*, 22 Amer. Rep. 261, *supra*.

The only remaining source from which it is, or can be claimed, that this exclusive right can be derived, is from the general law of the State having reference to the incorporation of street railway companies.   The appellee corporation, the Birmingham Street Railway Company, was organized under this law, as found embraced in sections 1917 to 1929 of the present Code (1876.)   It can have no other rights, therefore, than such as are conferred by, or authorized to be contracted for, under this statute.   The section relied on by the appellee's counsel is section 1921 of the Code, which reads as follows:

" Such corporation shall have power to construct, maintain and use a street railroad, upon the streets, and upon the line, and between the *termini* named in the certificate, upon such terms, and in such manner as may be authorized by an ordinance, or other lawful act of the proper corporate authorities of the city or town in which it is proposed to build and use the street railroad.   And such railroad company may contract with the city or town therefor, and the contract may be altered when both parties agree to the change."—Code of 1876, § 1921.

The city of Birmingham, as we have shown, has no distinct power in its charter, express or implied, to grant this exclusive franchise.   Is there anything in this section of the Code to authorize it?   Conceding that the city is invested with authority to contract with the company for the construction

and running of a street railway, as a necessary correlative of the company's power to contract with the city; does this, by necessary implication, confer the power to contract for a monopoly of privilege, and one in perpetuity? We are forced to the conviction that it does not. The inquiry, in fact, is answered by one clearly settled principle of law, which is now thoroughly imbedded in our American jurisprudence, and is deemed to be of vast importance in the economy of our system of free government, especially in view of what may now be considered as the baleful result of the celebrated Dartmouth College Case, in the perpetuity of special privileges conferred by franchises from governments. This principle is, that the charters of corporations are to be strictly construed against the corporators, and that no franchise which is granted by the State is ever construed to be exclusive, whether it be in the nature of a contract or not, unless it be so declared in clear terms, or be necessarily implied; or, as expressed by a learned author, "unless the element of exclusiveness appears in the grant itself;" and by another, unless the "terms of the grant render such construction imperative."—1 High on Injunc. (2d Ed.), § 902; Cooley's Const. Lim. (5th Ed.) 499 (*396). There has been no departure in this country from this doctrine since the decision of the *Charles River Bridge Case* by the United States Supreme Court, as far back as the year 1837. *Charles River Bridge v. Warren Bridge,* 11 Pet. 420. It was there said by Chief-Justice TANEY, that "in charters of this description, no rights are taken away from the public, or given to the corporation, beyond those which the words of the charter, by their natural and proper construction, purport to convey." Upon precisely the same principle it has been held, and must logically follow, that no municipal corporation, which is but the creature of the State, can make a grant of exclusive rights, whether by ordinance in the nature of a contract, or otherwise, unless the power to do so is expressly granted by the law-making power, or unless it be so far necessary to the proper execution of other powers expressly granted as to make its existence free from doubt.—*The State v. The Cincinnati Gas Light Co.,* 18 Ohio St. 262. As said by Mr. Dillon, "such a corporation has not an exclusive power over the subject, unless, by express words, or necessary inference, it be plainly given to it by the legislature."—1 Dillon on Mun. Corp. (3d Ed.) § 114. Judge Cooley adopts the view, that a municipal corporation can not, "without explicit legislative consent," permit the construction of a street railway in its streets, and confer on the projectors "privileges exclusive in their character, and designed to be perpetual in duration."—Cooley's Const. Lim. (5th Ed.) 252 (*207). No reason is perceived why this principle is not

entirely sound, and in strict conformity to every rule pertaining to the true functions of municipal corporations. Whatever power they may have over the public streets within their limits, is in the nature of a trust. This they can exercise only for the benefit of the public, and not of particular individuals or corporations. They have no implied power to barter away to-day, as a monopoly to one, that which the public necessities of a growing city may require to be reserved, in order that it may be exercised for the public benefit on to-morrow. And such seems to be the sounder and better doctrine, although some adjudged cases may be found which seem to sustain a different view.—2 Dillon, Munic. Corp. (3d Ed.) §§ 715–716.

We nowhere find where the city authorities of Birmingham had any power to invest the appellee corporation with the exclusive right which is here claimed.

We might stop here with this case, without extending this opinion further. But the principle involved is of such great public importance as to justify, if not require, a consideration of the constitutional objection which is urged to the existence of this right. The argument is further made, that the General Assembly is prohibited by the organic law from making such an irrevocable grant, and, therefore, under no circumstances, can it be done by a municipal corporation, which is the mere agency of the State, exercising only derivative powers. The power of the agent, it is said, can not exceed that of the principal.

Article I, section 23 of the present constitution of Alabama, provides, that no law shall be passed by the General Assembly "making any *irrevocable grants of special privileges or immunities.*"

Section 2, of article 14, reads as follows: "All existing *charters*, or grants of *special or exclusive privileges*, under which a *bona fide* organization shall not have taken place, and business been commenced in good faith, at the time of the ratification of this constitution, shall thereafter have no validity."

These provisions occur for the first time in the constitution of 1875, and have not before been the subject of construction by this court.

What, it may be asked, is the nature of these special or exclusive privileges, which are thus prohibited to be granted by the legislature? It seems plain from the very terms used, that the evil intended to be specially prevented was the granting of exclusive privileges in the nature of a monopoly by the legislative creation of corporate franchises. Monopolies were void at the common law, and are not commonly conferred by legislative grant, and need no special prohibition in the organic law

[Birmingham & Pratt Mines St. R'y Co. v. Birmingham St. R'y Co.]

of a free republic. They may now be regarded as relics of governmental folly, rendered odious by royal prerogative in the most extravagant periods of the European monarchies. In the strict sense, a monopoly is an exclusive right granted to one person, or a class of persons, of something which was before of common right. A franchise is a special privilege conferred by the State or government upon individuals, and which does not belong to citizens of the country by common right. It has been a common legislative practice to make grants of this kind, and they have led to much and protracted litigation in all of the American courts. Examples of this kind are found in numerous cases where the exclusive privilege has been conferred on favored individuals, and corporations, to manufacture and sell gas in a city ; or to supply the inhabitants with water; or to construct a bridge, or run a ferry across a river, between two given points, free from competition within certain limits; or to construct a canal, turn-pike, or railroad between certain designated *termini;* or to construct and rent a market-house in a city ; or to own and control the only premises which can be lawfully used for the slaughter of live-stock within municipal limits; or, in fine, as has been done many times in this and other States, to confer on favored corporations an irrevocable exemption from the common burdens of equal taxation, either by exacting from them an inconsiderable *bonus* in commutation of all future taxation, or else exacting from them no taxes at all. The following cases illustrate monopolies of this kind, so often conferred by legislative franchises: *New Orleans Gas Co. v. Louisiana Light Co.*, 115 U. S. 650; *New Orleans Water-Works Co. v. Rivers*, Ib. 674; *The Binghampton Bridge*, 3 Wall. 51; *City of Chicago v. Rumpff*, 45 Ill. 90; *Slaughter-House Cases*, 16 Wall. 36; *Gale v. Kalamazoo*, 23 Mich. 344; s. c., 9 Amer. Rep. 80; *Atlantic City Water-Works v. Atlantic*, 39 N. J. Eq.; s. c., 10 Amer. & Eng. Corp. Cases, 59 ; *Norwich Gas-Light Co. v. Norwich City Gas Co.*, 25 Conn. 19 ; *Mobile R. R. Co. v. Kennerly*, 74 Ala. 566; *Daughdrill v. Alabama Life Ins. Co.*, 31 Ala. 91 ; *Home of the Friendless v. Rouse*, 8 Wall. 430. The very fact that the legislature could, according to the better view, make irrevocable grants of this nature, was the very reason, no doubt, why the organic law was made so as to prohibit such grants in the future. In the struggling infancy of States and communities, the temptation has been very great to offer them, as a reward to the investment of capital. The injustice and inequality of their operation have only been illustrated in the light of the rapid increase of our population, the steady growth of our wealth, and the wonderful discoveries of modern science. It now more fully becomes manifest that they prove iron bands

[Campbell Printing Press & Man. Co. v. Jones.]

to fetter the growth of public industry, enterprise, and commerce. Free competition in all departments of commercial traffic is justly deemed to be the life of a people's prosperity. The policy of the law, as now declared by our constitution, is as clear in the condemnation of the grant of irrevocable exclusive privileges conferred by franchise, as that of the common law was in the reprobation of pure monopolies, which were always deemed odious, not only as being in contravention of common right, but as founded in the destruction of trade by the extinguishment of a free and healthy competition.—*The Case of Monopolies*, 11 Rep. 84.

The exclusive right of the appellee to the privilege claimed, in our opinion, can not be sustained. The General Assembly would itself have no power under the constitution to make such a grant. *A fortiori*, a mere municipality would have no such power. Nor can we find, upon any proper principle of construction, that it has anywhere been attempted to confer such a power upon the municipal authorities of Birmingham. They had as much right, therefore, in the exercise of their lawful governmental agency, to give their consent to the appellants to construct and maintain a street railway, in the streets and avenues of the city, as they had to grant the same right to the appellee corporation.

These views result in the reversal of the chancellor's decree. He erred in not sustaining the demurrer, and in refusing to dismiss the bill for want of equity. The injunction should have also been dissolved. We will accordingly enter a judgment here ordering the dissolution of the injunction, and will reverse and remand the cause, that the complainants may have an opportunity to amend the bill, if practicable, so as to give it equity. This is without prejudice to appellee's right to apply for a new injunction, provided the bill can be amended, so as, in the chancellor's opinion, to give it equity, without making an entirely new case. We will not say this is impossible.

Reversed and remanded.