527 So.2d 678 (1988)
ALABAMA POWER COMPANY
v.
CITIZENS OF the STATE OF ALABAMA, et al.
DIXIE ELECTRIC COOPERATIVE, et al.
v.
The CITIZENS OF the STATE OF ALABAMA, et al.
86-1007, 86-1008.
Supreme Court of Alabama.
February 26, 1988.
On Rehearing June 17, 1988.
*680 Charles M. Crook, Robert A. Buettner, John F. Mandt, and Karl R. Moor of Balch & Bingham, and Robert A. Huffaker and J. Theodore Jackson, Jr., of Rushton, Stakely, Johnston &Garrett, Montgomery, for appellants.
Robert D. Thorington, W. Stanley Gregory and Wendell Cauley of Johnson & Thorington, and Robert D. Segall of Copeland, Franco, Screws & Gill, Montgomery, Robert H. Walstohn of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, for appellee City of Opelika.
John P. Adams of Bradley, Arant, Rose & White, Birmingham, for amicus curiae Utilities Bd. of City of Sylacauga.
James M. Campbell, Speaker Pro Tem., House of Representatives, Alabama State Legislature, Anniston, for Concerned Members of Alabama State Legislature.
Wallace F. Tillman, Sr. Regulatory Counsel, for amicus curiae Nat. Rural Elec. Co-op. Ass'n.
Drayton N. Hamilton, Montgomery, for amicus curiae Alabama League of Municipalities.
Albert L. Jordan and William A. Ratliff of Wallace, Brooke & Byers, Birmingham, for amicus curiae City of Lincoln, Ala., in support of application for rehearing.
TORBERT, Chief Justice.
These appeals are from a Montgomery County Circuit Court judgment declaring Code 1975 §§ 37-14-1 to -17 (Supp.1986) (the "1984 Act") and Code 1975 §§ 37-14-30 to -40 (Supp.1986) (the "1985 Act") unconstitutional and invalid in their entirety under Article 12, Section 220, of the Constitution of Alabama of 1901. The original plaintiffs, 22 electric cooperatives, initiated the proceedings below by filing a complaint pursuant to the 1984 and 1985 Acts' "validation" mechanisms for a judicial consideration of the Acts' constitutionality, and also pursuant to the Alabama declaratory judgment statute. The plaintiff cooperatives named as defendants all municipal electric suppliers in the state, Alabama Power Company, and the citizens of Alabama. Alabama Power Company was later realigned as a party plaintiff. The plaintiffs are the appellants here.
The 1984 and 1985 Acts were enacted for the putative purpose of minimizing or eliminating the deleterious effects of wasteful duplication of electric distribution facilities in the State of Alabama; and both Acts sought to address the problem of duplication in a similar fashion by establishing a comprehensive statewide system of service territories and assigning a territory to each of the State's retail electric suppliers. In order to understand the issues presented, it is necessary to present some information on the current state of the power suppliers in Alabama.
1. Retail Electric Suppliers in Alabama: Three categories of entities operate electric distribution facilities for retail electric service in the State: 1) public utilities subject to the regulation of the Alabama Public Service Commission ("APSC"); 2) rural electric cooperatives; and 3) municipally owned and operated systems ("municipal electric suppliers"). Alabama Power Company ("APCo") is the only public utility serving at retail and subject to the APSC at the present time.
2. Regulation of Facility Duplication Prior to 1984.
a) Inside Municipal Limits: The majority of the municipalities outside the Tennessee Valley Authority (TVA) service area have granted franchises to APCo to provide retail electric service to their citizens. A small number have selected cooperatives as their franchisees. Thirty-six municipalities in Alabama have established municipal electric suppliers. Any extension of electric distribution systems within municipal limits must be approved by municipal authorities.
b) Outside Municipal Limits: There have been few, if any, restrictions on extensions outside municipal limits. APCo is restricted by Code 1975, § 37-4-28, which provides that no extensions may be made by APCo, except ordinary extensions of existing systems, without permission of the APSC. Since most extensions are ordinary extensions of existing systems, APCo *681 usually does not have to get permission. Also, municipalities have had authority under Code 1975, § 11-50-1, to provide electric service outside the municipal limits, but only a limited number have done so. When areas not previously within municipal limits have been annexed by municipalities, and the annexed area already had an electric supplier, that electric supplier's distribution facility has been allowed to remain and be utilized for service to customers who were being served prior to annexation.
The APSC's authority is limited by statute. It had no jurisdiction over territorial agreements between cooperatives and municipal electric suppliers, nor can it require utilities to reach an agreement in order to prevent facility duplication. The 1984 and 1985 Acts were purportedly attempts to deal with unnecessary duplication.
3. 1984 Act: The rules established by the 1984 Act for the purpose of preventing duplication can be divided into three categories: 1) rules governing activities outside municipal limits; 2) rules governing activities inside existing municipal limits; (i.e. municipal boundaries as of April 26, 1984); and 3) rules governing special situations. In addition, the 1984 Act established a validation mechanism, which, together with the history of litigation under the mechanism, is described below.
a) Outside Existing Municipal Limits: Section 3 of the 1984 Act, Code 1975, § 37-14-3 (Supp.1986), established rules for extension of service in areas outside the existing municipal boundaries. The rules governing areas outside municipalities may be summarized as follows: 1) electric suppliers are prohibited from extending service to a premise already being served by another electric supplier, and 2) no electric supplier may extend its facilities to provide service to a new premises located within the boundaries of the assigned service area of another electric supplier, except in cases of industrial customers whose electric load will exceed 2500 kilowatts, where customer choice will prevail. Each area outside existing municipal boundaries is assigned to a particular electric supplier. The assignment continues to govern even if a municipality subsequently annexes the area. These restrictions prohibit suppliers from extending duplicative lines into the assigned areas of other suppliers; however, if an area is subsequently annexed, the municipality must give its consent to the assigned electric supplier if any more facilities are to be built. The State-assigned electric supplier will be the only one permitted to serve the annexed area.
b) Inside Existing Municipal Limits: Section 4 of the 1984 Act, Code 1975, § 37-14-4 (Supp.1986), established an option for the primary electric supplier in every municipality to purchase the electric distribution facilities of other suppliers within "existing municipal limits". If the primary electric supplier chooses to purchase the existing facilities of the secondary electric supplier, then the primary electric supplier may purchase the secondary electric supplier's facilities at a price determined by a formula specified in Code 1975, § 37-14-4 (Supp.1986). Should the primary electric supplier elect not to purchase the facilities of the secondary supplier within the existing municipal limits, the secondary electric supplier is permitted to maintain its existing facilities in that municipality, and becomes the assigned supplier to serve those new customers inside the municipality that locate closer to its electric lines than to the electric lines of other electric suppliers. In these circumstances, all other suppliers would be prohibited from extending any facilities into the area assigned to the secondary supplier. The secondary electric supplier can expand and serve new customers with the consent of the City.
c) Special Rules: Section 7 of the 1984 Act, Code 1975, § 37-14-7 (Supp.1986), recognizes that special rules are necessary to accomplish the objective of the Act in certain areas of the State. In some areas of the State, the agreements that had been reached by the electric suppliers and approved by the APSC were credited by the Legislature as being in the public interest and were adopted as rules governing the prevention of duplication of electric facilities in the areas covered by the agreements.
*682 d) The 1984 Act Validation Mechanism: The Legislature developed a mechanism for judicial consideration of the 1984 Act's constitutionality prior to the time electric suppliers become irrevocably committed to the transactions authorized by the Act. The Act provides for judicial proceedings to "validate" i) purchases of electrical distribution facilities effected pursuant to the 1984 Act, as well as ii) the provisions of the 1984 Act itself. Under the Act, a proceeding could be initiated by an affected secondary supplier whose distribution facilities were subject to the provisions of the Act, and whose facilities might be purchased pursuant to the Act by a primary electric supplier. These proceedings would be for the purpose of seeking a judicial determination of the legality and validity of such purchase of facilities pursuant to the provisions of the Act, and a determination of all other questions of the legality or validity of the provisions of the Act.
The 1984 Act provided that all of the citizens of Alabama be named defendants in such a validation proceeding. Also, each electric supplier in the State was to be given notice of the validation proceedings and could petition to intervene. The failure of an electric supplier to participate in the validation proceeding constituted a permanent waiver of its right to question the validity of the 1984 Act.
e) Non-severability Clause: The 1984 Act also provided that if any of its provisions are finally determined by a court to be invalid, the entire act is rendered invalid.
f) Litigation Concerning the 1984 Act: On May 1, 1984, shortly after the 1984 Act became effective, certain cooperatives initiated a civil action in the Montgomery County Circuit Court. The suit was filed pursuant to the 1984 validation mechanism as well as the declaratory judgment statute. The complaint in this action named the citizens of Alabama, APCo, and certain municipalities as defendants. The lawsuit was ultimately removed to the United States District Court for the Middle District of Alabama after certain of the defendant municipalities filed a third-party complaint naming the Tennessee Valley Authority as a defendant.
On November 2, 1984, approximately six months after the Act became effective, the district court ruled that the 1984 Act was unconstitutional because: 1) the Act attempted to regulate TVA and thereby violated the supremacy clause of the federal constitution; 2) the Act violated § 220 of the Alabama Constitution; and 3) the Act's validation provisions forced adjudication of nonjusticable issues and thus violated the federal and state constitutions. The cooperatives and APCo appealed the district court's order to the Eleventh Circuit Court of Appeals.
4. The 1985 Act. The 1985 Act was a reenactment of the 1984 Act, except for some significant differences. First, the non-severability clause in the 1984 Act was altered in the 1985 Act. In contrast to the 1984 Act's broad provision that a finding of invalidity of any provision of the 1984 Act would invalidate the remaining provisions, the 1985 Act provides that the entire Act would be invalid only upon a finding of invalidity respecting the following provisions: i) the provision governing retail electric service outside municipal limits; ii) the provision governing retail electric service within municipal limits; or iii) the provision governing the enumerated agreements that were exempted. Code 1975, § 37-14-39 (Supp.1986). In all other respects, the 1985 Act provides that its provisions are severable. Second, in an effort to remove the Section 220 constitutional concerns, the 1985 Act expressly made the legislative franchises granted to the electric suppliers by the Act "subject, nevertheless, to consent of the municipality with respect to any construction or operation for which a municipal consent is required." In other words, the 1985 Act provided that the Act's legislative franchises were conditioned upon the franchisee's obtaining any required municipal consent. If the municipality does not grant the necessary consent, electrical services may be discontinued in certain areas.
a) Litigation Under the 1985 Act: Less than two weeks following the 1985 Act's *683 enactment, the United States District Court for the Middle District of Alabama held the 1985 Act invalid as contravening the provisions of § 220, as well as on other grounds. The District Court held that the Act, which allowed for the municipalities to consent to the electric supplier designated by the state or have no electric supplier, did not allow for the true consent required by § 220.
5. Eleventh Circuit Appeal: The cooperatives appealed from the district court's ruling on the 1985 Act. The appeals regarding the 1984 and 1985 Acts were consolidated by the Eleventh Circuit. On May 1, 1986, Eleventh Circuit vacated the district court's orders with respect to both the 1984 and the 1985 Acts, and remanded the case with instructions that it be dismissed on the ground that it had been improperly removed. The District Court dismissed the case in accordance with the Eleventh Circuit's order.

I.
This case involves two primary issues. First, does § 220 of the Alabama Constitution give a municipality the power to affirmatively choose its electric supplier in all cases, or does it simply allow a municipality the right to determine whether its streets will be burdened by a utility? Second, are the Acts to be declared unconstitutional on grounds that they force a municipality to consent to a utility service, in contravention of a municipality's § 220 right?

II.
In determining what power is granted to municipalities by § 220, a discussion of the nature and the source of that power is appropriate.
Traditionally, the State alone has the power to regulate the activities of public utilities and to authorize them to conduct their business in a particular area of the State. The United States Supreme Court has observed that "the regulation of utilities is one of the most important of the... police power of the states." Arkansas Elec. Co-op. v. Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983) (citing Munn v. Illinois, 94 U.S. (4 Otto) 113, 24 L.Ed. 77 (1877)). In Lindsay v. Mayor and City Council of Anniston, 104 Ala. 257, 16 So. 545 (1883), this Court noted, regarding businesses affected by the public interest:
"[T]he power lies in the legislature, in the absence of constitutional restraint or limitation, to regulate, to prescribe the rules according to which their business may be conducted. [Citation omitted.] The power may be, and is often, delegated to municipal corporations, to be exercised for the promotion of public convenience."
104 Ala. at 261, 16 So. at 546. Lindsay indicates that the power to regulate utilities belongs first to the state and can be withdrawn only by some provision of the constitution. See, California v. Central Pac. R.R., 127 U.S. 1, 8 S.Ct. 1073, 32 L.Ed. 150 (1888). If the State has not been divested of such power by the Constitution, then that power remains with the State; but the State may delegate such power by legislation.
The municipality's only power to regulate utilities is the power granted to it by the Constitution or by state legislation. Therefore, if the city has the right to choose its utility supplier, that right must be found in the Constitution or in state legislation. In the present situation, the Constitution, by Section 220, has granted the city only the right to grant or withhold consent. Section 220 does not say that the city has the right to name the supplier, only that no utility may operate on the city's streets without the city's permission. Our construction of § 220 must be viewed in light of the fact that the power to regulate utilities is initially a State police power. It is inappropriate to divest the state of its police powers where there is no express or clear mandate.

III.
Section 220, Constitution of Alabama of 1901, provides:
"No person, firm, association, or corporation shall be authorized or permitted to use the streets, avenues, alleys, or public *684 places of any city, town, or village for the construction or operation of any public utility or private enterprise, without first obtaining the consent of the proper authorities of such city, town, or village."
The manner in which § 220 is phrased, "without first obtaining the consent" indicates that the Constitution requires only that the city have the right to give or withhold its consent; it does not say the city has an absolute right to choose any supplier it desires. The restricted phrasing of § 220 is indicative of its narrow meaning. Although the language of § 220 is clear, case law must also be examined.

IV.
Case law in Alabama, in its interpretation of § 220, has granted the city no more than the right to choose a utility that the State has allowed. As early as 1885, this Court construed article 14, § 24, of the 1875 Constitution, the predecessor to § 220. In Birmingham & Pratt Mines St. Ry. Co. v. Birmingham St. Ry. Co., 79 Ala. 465 (1885), the Court explained that the municipal consent provision "is prohibitory, and not permissive in nature, and confers no franchise or right of any kind on any person or corporation." Id. at 470. The Birmingham Pratt Mines Court held that the predecessor of § 220 did not give the city an independent power to name a utility supplier. A city may exercise such franchise powers as are granted to it in their charter, or such police powers as are implied in its charter. See id. at 470-71.
The Court considered the meaning of § 220 in Ex parte Ashworth, 204 Ala. 391, 86 So. 84 (1920). The Ashworth Court rejected the proposition that municipalities have unfettered discretion in choosing a utility supplier.
"Manifestly, it was not the purpose of the Constitution makers, by introducing sections 220 and 228 into the Constitution of 1901, to divest the state of this sovereign power and vest it in cities and towns, but rather to restrict or limit the power of the Legislature and cities and towns possessing statutory authority to grant such use in the exercise of that power. By general statute, Code 1901, § 1268, the Legislature has conferred on cities and towns power to `regulate the use of streets for the erection of telegraph, telephone, electric and all other systems of wires and conduits, ... and generally to control and regulate the use of the streets for any and all purpose.'"
204 Ala. at 393, 86 So. at 85.
This language indicates that § 220 does not divest the State of its power to have control over what utilities may function in Alabama, and that § 220 acts as a restriction on the Legislature's power to allow a utility to function in a city. In effect, the State can not force a city to develop a utility system.
The Ashworth Court further explained: "[t]he state in the exercise of its sovereign power of police, by legislative enactment, observing constitutional restrictions and limitations, may grant to cities and towns the power to make use of their streets for the construction and maintenance of public utilities...." This statement indicates that § 220 is prohibitory in nature, providing the municipality with only a veto power. 204 Ala. at 392, 86 So. at 85. This language also indicates that the power of the State is an affirmative one that allows the State to grant to the city the right to set up utilities.
The cities do not have an absolute right to choose whomever they desire as their utility suppliers. The Ashworth Court interpreted § 220 as granting municipalities the right to grant or withhold their consent as a condition of any authorization given by the Legislature; i.e., the municipality has only a veto power under § 220.
Again, in Phenix City v. Alabama Power Co., 239 Ala. 547, 195 So. 894 (1940), the Court held that the power of the city to grant a franchise is by virtue of legislative authority, and that § 220 "is not a grant of such power, but the reservation of a restriction on legislative authority." Phenix City, 239 Ala. at 554, 195 So. at 899. Phenix *685 City indicates that § 220 does not divest the State of its sovereign power to determine who may be granted a franchise and invest it in the cities. But § 220 does allow a city to control its streets by guaranteeing that the city has at least a veto power over what may be placed on its street. The Phenix City Court explained, "[t]he State has conferred on cities the power to grant franchises.... Formerly it was usually in the city charter." 239 Ala. at 554, 195 So. at 899. The Phenix City Court also indicated that a city was able to grant a franchise because the State had specifically allowed it in the city's charter, or the power was implicit in the city's charter.
The decisions that the appellees cite essentially stand for no more than the proposition that municipalities have the irrevisable discretion to consent or withhold their consent as to whether a utility will burden their streets. In Weller v. City of Gadsden, 141 Ala. 642, 37 So. 682 (1904), the Court held that "Under the Constitution, (Sec. 220) and its charter power over its highways and public places (citations omitted) the city of Gadsden had authority to grant to the complainants, the right to contract and operate a system of water works...." 141 Ala. at 655, 37 So. at 684. The Court did not hold that § 220 was any more than a veto power of the cities. The Weller Court does hold that a city has the power to grant a franchise to a utility supplier under § 220 and its charter powers. It is important that the Weller Court mentioned the cities' charter power. While the charter the State grants may allow the city to grant a utility franchise, the State may limit that charter by withholding the privilege to grant a franchise. However, the State can not destroy the city's § 220 right to withhold consent.
The Court held in Birmingham Interurban Taxicab Service Corp. v. McLendon, 210 Ala. 525, 98 So. 578 (1923), only that "`No' one shall be authorized or `permitted to use the streets' for the purposes named `without first obtaining the consent' of the `proper authorities' of the `city'." 210 Ala. at 527, 98 So. at 579-80. McLendon indicates that § 220 "`contemplates the permanent preservation of the municipal right to control, by withholding consent, the use of the streets.'" 210 Ala. at 527, 98 So. at 579, quoting City of Montgomery v. Orpheum Taxi Co., 203 Ala. 103, 82 So. 117 (1919). The McLendon Court also held that "The power to grant the franchise or easement here involvedto consent or not to consent to a taxicab business on the streets of Birminghamis a power guaranteed by the Constitution." 210 Ala. at 528, 98 So. at 580. While the McLendon Court used the words "franchise" and "easement" to describe § 220 control, simply stated, the city has a right to control the streets by granting or withholding consent.
In City of Mobile v. Farrell, 229 Ala. 582, 158 So. 539 (1934), the Court stated:
"The effect of a legislative franchise is limited by constitutional restrictions, such as contained in sections 22, 220, 228 Constitution of 1901. Section 220 was not intended to divest the state of its sovereign power and invest it in the cities. But it means that the right of the Legislature to grant a franchise for the use of streets in a city or town for a public utility or private enterprise is subject to the consent of such city or town. Ex parte Ashworth, 204 Ala. 391, 86 So. 84 [1920].
"But for the time being, the Legislature has delegated to the cities this right as shown in sections 2016 and 2163, Code. [1923]."
229 Ala. at 585, 158 So. at 541.
The language in Farrell is ambiguous at times, but we interpret Farrell as saying that a city has the right to consent or withhold consent, and, with the authority granted by the Legislature, the city has the additional right to grant a franchise to whomever they desire.
In City of Decatur v. Meadors, 235 Ala. 544, 180 So. 550 (1938), the Court held:
"It is well settled that no one has a natural or inherent right to operate motor vehicles, as a common carrier of passengers, on the streets of the municipalities of this state. [citations omitted].

*686 "Section 220 of the Constitution vests in cities and towns an irrevisable discretion to refuse or grant to such carriers the right to use their streets and ways in the conduct of such business...."
235 Ala. at 547, 180 So. at 552-53. The above language simply states the obvious: Section 220 gives the municipalities a measure of control over their streetsthey can deny or grant the use of the streets to common carriers or public utilities that ask for access. In Meadors the city was free to deny or grant licenses for the right to use its city's streets to those otherwise qualified by the State to operate motor vehicles; the applicants were limited only by the market. The Meadors Court did not rule that a municipality has the power to name a carrier in disregard of the State's prohibition. Meadors is limited to the holding that a city has no more than a right under § 220 to veto a particular use of city streets. See, Bush v. City of Jasper, 247 Ala. 359, 24 So.2d 543 (1945).
Again, in the cases of Covington Elec. Coop. v. Alabama Power Co., 277 Ala. 162, 168 So.2d 5 (1964), and Clarke-Washington Elec. Membership Corp. v. Alabama Power Co., 272 Ala. 598, 133 So.2d 488 (1961), the Court indicates that the power granted by § 220 to the city is simply a power to withhold consent. First, in the Covington Elec. Coop. case, the question was whether a certificate of convenience and necessity was required from the APSC authorizing Alabama Power Company to extend its distribution lines into the town of Samson. That case held that a proper construction of the Alabama public utility law and § 220 rendered a certificate unnecessary when the city had authorized the extension. 277 Ala. at 166, 168 So.2d at 10.
From this holding, the appellees draw the conclusion that the city has a power superior to that of the Statethe absolute power of choice over who will be the utility supplier. However, the Covington Elec. Coop. decision was predicated upon the construction Code 1940, § 20, Tit. 48 (the predecessor to Code 1975, Section 37-1-35), which expressly provided that nothing in the public utility act was intended or should be construed "[t]o limit or restrict the police jurisdiction or power of municipalities over their streets, and over highways and public places." (As quoted at 277 Ala. 164, 168 So.2d 8). In essence, the Court held that the City could authorize the construction under existing state law. The predecessor to Code 1975, Section 37-1-35, relieved utility suppliers of the requirement of having to obtain a certificate from the APSC if they obtained permission from the municipality. The Court did not hold that the § 220 alone was the reason that the utility did not have to get a certificate from the APSC. See Birmingham Elec. Co. v. Allen, 217 Ala. 607, 117 So. 199 (1928).
Finally, we come to the decision of Clarke-Washington Elec. Membership Corp. v. Alabama Power Co., 272 Ala. 598, 133 So.2d 488 (1961). Clarke-Washington involved a situation where an electric cooperative attempted to prevent the duplication of its power lines by another public utility in an area that had been annexed by a city. Prior to the annexation, the county in which the cooperative was located had given its permission for the cooperative to operate. When the city annexed the area in which the cooperative was operating, the city gave its permission for another public utility to operate in the annexed area. The Clarke-Washington Court held that when a city annexes territory where an electric supplier is currently serving, § 220 operates prospectively to prevent the current supplier from expanding without the consent of the municipality that has annexed the area:
"It seems to us when any area of a county becomes a part of a municipal corporation, Section 33 of Title 18 [Code 1940] must yield to Section 220.... The proviso which we have emphasized in ... Section 33 appears to have been inserted in order to comply with Section 220...."
272 Ala. at 605, 133 So.2d at 493. The emphasized provision in § 33 stated that "the respective authorities having jurisdiction thereof shall consent thereto." However, the Court explained that § 220 did not act retroactively; the current supplier did not have to get permission from the municipality *687 for continued operation of its facilities then in existence.
It is important to note that under the law at the time Clarke-Washington was decided the municipality could grant a franchise to whomever it desired. Simply stated, the municipality could, under § 220, prevent the cooperative from expanding, and, in conjunction with the law in effect at that time, the municipality could determine who would be the power supplier. Therefore, the Court was not saying that § 220 was the individual source of granting a utility franchise. If the state law at the time of Clarke-Washington had allowed only the cooperative to operate in the annexed areas, then the city could not name another franchisee. However, the city could still maintain its § 220 right to withhold consent from the cooperative in order to prevent the cooperative from expanding, provided the exercise of its § 220 right did not violate any other constitutional guarantees. Clarke-Washington does not hold that a municipality can choose a utility supplier that the state prohibits.
Other state Supreme Courts have construed state constitutional provisions, similar to Alabama's § 220 as granting only a veto power and not an affirmative right to grant franchises. See City of Nicholasville v. Blue Grass Rural Electric Co-op Corp., 514 S.W.2d 414 (Ky.1974); City of Abbeville v. Aiken Elec. Co-Op., Inc., 287 S.C. 361, 338 S.E.2d 831 (1985). In City of Abbeville, the South Carolina Supreme Court was asked to consider the constitutionality of a statute that altered prior South Carolina law relating to the rights of cities as utility suppliers to provide electric service in areas annexed by cities and in areas newly incorporated. The cities argued they had an absolute constitutional right to determine the franchises within the annexed areas and that the constitutional municipal consent provision, S.C. Const. art. VIII, § 15, should be construed "as an exclusive franchising provision beyond the reach of statutory legislation." 287 S.C. at 365, 338 S.E.2d at 833. The court held that the power to franchise is an attribute of state sovereignty that can be delegated to municipalities only by statute. The South Carolina Court stated:
"The language in § 15 vests a veto power in the Cities, not a franchising authority.
"The consent provision of § 15 is not an affirmative grant of franchise power, but is a restriction on legislative authority."
287 S.C. at 368, 338 S.E.2d at 835 (emphasis original). The South Carolina Court not only determined that South Carolina's municipal consent provision granted no more than a veto power, but did so, in large measure, in reliance upon Alabama cases interpreting § 220. Id. 287 S.C. at 367-68, 338 S.E. at 834-35.
No Alabama case holds that the city has the right to grant consent to an entity to use the streets and rights-of-way where the State has prohibited that entity from so acting. In granting consent for a given use of a city street, a municipality as a matter of course "grants rights" and "names a grantee." Accordingly, the "granting of rights" mentioned in the cases cited above is simply a reference to those rights that flow from a city's power to veto the use of its streets. The source of authority for a city to grant a franchise comes from § 220, along with either a specific statute authorizing the city to grant a franchise or the police powers inherit in a city charter. See Weller v. City of Gadsden, 141 Ala. 642, 37 So. 682 (1904), Birmingham Interurban Taxicab Service Corp. v. McLendon, 210 Ala. 525, 98 So. 578 (1923); City of Mobile v. Farrell, 229 Ala. 582, 158 So. 539 (1934); City of Decatur v. Meadors, 235 Ala. 544, 180 So. 550 (1938); Covington Elec. Coop. v. Alabama Power Co., 277 Ala. 162, 168 So.2d 5 (1964); Clarke-Washington Electric Membership Corp. v. Alabama Power Co., 272 Ala. 598, 133 So.2d 488 (1961).
The wording of § 220, Alabama case law, other states' case law, and the fact that regulation of utilities is traditionally a sovereign power of the state lead this Court to conclude that the only right granted by § 220 is a veto power and not an affirmative power to grant franchises.

*688 V.
The last argument of the appellees is that even if § 220 gives the municipalities only the right to veto whether a particular utility will burden its streets, the Acts take away even this limited power. The appellees claim that in a certain situation the Acts coerce municipalities' consent in violation of § 220. The appellees argue that this would occur where the municipality is forced to consent to an electric supplier's burdening its streets because to exercise the municipality's § 220 right to veto any utility service would deny electricity to persons who are, in all other respects, in the same circumstances as others to whom essential utility services are made available. This Court will now examine the appellees' argument that the Acts coerce the municipalities into consenting to utilities burdening their streets. This case can be resolved by simply assuming that an equal protection violation occurs. However, we are not deciding that there is an equal protection violation.
The appellees argue that a municipality would be coerced into consenting to a utility supplier's burdening its streets in the following situation: Once the municipality has consented for the secondary supplier to operate its current facilities in the municipality, the 1985 Act mandates that the secondary power supplier be the only one allowed to serve any person that locates in the municipality where that person is closer to the secondary supplier than to the primary supplier and where there are no current facilities. The appellees argue that if this person is situated similarly to others in the municipality, this person has a right to have electric power connected to his or her house because of equal protection considerations. Therefore, assuming an equal protection violation, the municipality must consent to power being supplied to this house and the utility supplier must be the one designated by the Acts.
The appellees claim that their consent is coerced due to the application of the Acts. However, in the situation just described, the municipalities' consent is coerced due to a person's right to equal protection, not because of the operation of the Acts. Again, under the appellees' equal protection argument, the municipalities' § 220 right can not be fully exercised, because the appellees must consent regardless of their desire not to have their streets burdened with utilities. We have established that the appellees have, under § 220, only the right to consent or to withhold consent, not the right to choose who will supply their power. The Acts do not force the cities to consent to have their streets burdened; the Acts only determine who will burden the streets.
The appellees ask us to conclude that, because the municipalities' lose their right to consent, they should at least be granted the right to choose the supplier they desire. The question then becomes, "Must the State forfeit its right to determine who will supply electricity in Alabama?" The Appellees appear to believe that the State should forfeit this power to the municipalities. We do not agree. There is no basis in the Constitution to indicate that the State should be required to give up this particular sovereign power.
In reaching our decision, we have not determined that the exercise of a municipality's privilege under § 220 would necessarily violate any equal protection provision of the federal or State Constitutions. Nor have we made any determination that a city must supply power to any persons. We have simply determined that if there is a constitutional conflict as described by the appellees, this conflict does not result in the Acts' coercing the Appellees consent in violation of § 220.
We draw our conclusions from the aggregate. The State initially is the holder of all police power. It may delegate such power through legislation or it may be divested of such power by the Constitution. In § 220, the Alabama Constitution has given to the municipalities the right to withhold consent for their streets to be burdened by any person, firm, association, or corporation. The Alabama Constitution explicitly grants the municipalities the right to withhold consent and nothing more. We do not believe sovereign powers of the State should be *689 withdrawn without explicit constitutional direction. Alabama case law and case law from other states indicates that a municipality has only a veto power. As a result, we have determined that while the 1984 Act violated the municipalities' § 220 right, the 1985 Act allows for the municipalities to exercise their veto power, and is, therefore, not on that ground umconstitutional. We also hold that the 1985 Act has not been shown to coerce the consent of municipalities in contravention of § 220.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, JONES, ALMON, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
BEATTY, J., concurs in result.

ON APPLICATION FOR REHEARING
TORBERT, Chief Justice.
The appellees argue that the 1985 Act is invalid because, they say, it authorizes municipalities to deny certain defendant citizens of this state retail electric service without due process and equal protection of the law, as guaranteed under the Fifth and Fourteenth Amendments to the Constitution of the United States and Sections 6 and 13 of the Alabama Constitution. This issue was addressed in our original opinion; we determined that the 1985 Act was not the source of any potential equal protection or due process violation.
The appellees next argue, based on our interpretation of § 220 on original deliverancethe interpretation that because the municipalities have no affirmative franchise authority under § 220, and because the Legislature's authorization of only one retail electric supplier to serve each designated area within the State exclusively does not coerce the municipalities' consent in violation of § 220that the 1984 Act is no more violative of § 220 than is the 1985 Act.
The 1984 Act provided that in the event the primary electric supplier does not exercise the option to purchase the facilities of the secondary electric supplier, the secondary electric supplier shall have the right to continue to maintain its facilities and service and to make extensions to serve new premises "notwithstanding the lack of a franchise from the municipality in which such premises are located." In the 1985 Act, the following language was added immediately after the phrase quoted from the 1984 Act: "subject nevertheless, to the consent of the municipality for the construction or use of the streets, avenues, alleys, or public ways of the municipality to the extent such consent is required."
The 1984 Act simply provided that a franchise was not required from the municipality in order for a utility to operate. On original deliverance we held that § 220 was not the source of any municipal franchise rights. Notwithstanding the fact that it was generally believed that the use of the language at issue in the 1984 Act was an attempt to restrict the municipalities' § 220 right, it is now clear, based on our interpretation of § 220, that the phrase "notwithstanding the lack of a franchise from the municipality in which such premises are located" in no way limits § 220 rights.
Therefore, we agree with the appellees' contention that the allegedly offensive language in the 1984 Act is not violative of § 220 as presently interpreted. Because of the rule that when a statute may be given two reasonable constructions this Court should apply the construction that will uphold the legislative will, Baldwin County v. Jenkins, 494 So.2d 584 (Ala. 1986), and because the Legislature clearly preferred the 1984 Act, Code 1975, § 37-14-30, we hold the 1984 Act to be constitutional.
APPLICATION GRANTED; OPINION EXTENDED.
MADDOX, JONES, ALMON, SHORES, ADAMS and HOUSTON, JJ., concur.
BEATTY, J., concurs in the result.
STEAGALL, J., dissents.